Our next case on the call of the docket this morning is agenda number six, case number 114491. I forgot to ask how to pronounce the defendant's last name. People v. Trzeciak, you can correct me. Good morning, your honors. My name is Peter Fisher. I'm an assistant state's attorney on behalf of the people. I asked a woman in our office who speaks Polish, and she said it was Chick-Chak, I believe is how it's pronounced. I want to say that one more time. Chick-Chak, I think, something along those lines. In any event, your honors, under no rational system of justice should death threats issued while brutally beating your wife be considered privileged marital communications, subject to the marital privilege. As you'll recall in this particular case, the defendant and his wife, Laura, were at home. The phone rang. Laura answered the phone. The defendant was concerned that she was speaking to the man who would eventually become the victim in this case. The defendant became enraged. He began to beat her. He began to duct tape her mouth, duct tape her body, hog tire. He eventually issued death threats against her and against the man who would eventually become the victim. He threw her into his truck. They drove across. Now, these incidents took place in Indiana to begin with, in Hammond, Indiana. They drove right across the border into that area on the far southwest side of Chicago known as Hegwisch. There they went to a trailer park to the residence of the victim. The defendant jumped out of the car, pounded on the trailer door of the victim's residence. The victim wasn't home. The defendant got back in the car, drove back to Indiana, continuing to issue threats against the victim and against the wife. And eventually, he took her home and continued to beat her. Over the next several weeks, he continued to beat her and threaten her. Eventually, she was able to, she was locked in the home. The home was like a fortress. It was barred with steel doors and barricades, security cameras, things like that. He would leave her tied up with no way to get out. Eventually, she did get out. She called the police. The police came. She filed a complaint and a domestic violence warrant was issued for the defendant in the on that domestic violence warrant and on federal charges, gun charges. The defendant was tried for those federal charges and convicted. In the meantime, that bloody fingerprint that he left at the scene of the crime, the DNA was tested. It came back as a hit to the defendant. If you recall, there was a period of time, a woman, Kelly O'Nions, had been in that trailer in the afternoon of the murder and there was nothing wrong with the trailer and the windows weren't broken out. She went back later that evening. The windows were broken out and there is a piece of glass on a shed outside the trailer back window and that's where the defendant's to introduce the statements made by the defendant, threatening his wife and the eventual victim, under the notion that this was motive evidence, that the motive of the crime was a jealous husband killing the person that he suspected of having an affair with his wife. On appeal, the appellate court found that that admission of evidence violated the Marital Privilege Act. When we look at this act, we have to recall, first of all, the common law history of where all this came from. Mr. Fisher, let me ask you, let's just say we completely agree with you there should be a bad or abusive marriage exception. How do we get there without doing violence to our primary rule with respect to statutory construction, whether the statute is plain and unambiguous? And secondly, how do we get around even our case law, as in Sanders, which says the expansion of existing testimonial privileges and acceptance of new ones involves the balancing of public policy, which should be left to the legislature? Sure. I've got several things along those lines. First of all, I've never asked for a bad marriage exception. I've never argued for a bad marriage exception. I know that that term is used by the dissent in the appellate court, but I've never asked for a bad marriage exception, and I don't really believe you need to go that far. I believe that you can take the statute as it is written and interpret it to get to where we want to go. It is true that the primary rule of statutory instruction is to interpret the language of the statute in its plain meaning, but that's not the only rule of statutory instruction that's important. It also... Well, maybe the dissenter called it a bad marriage exception because the language says except in cases of crimes against each other, spousal abandonment, child welfare, or certain offenses involving children. I mean, you'd admit that this doesn't fit within those exceptions, does it? I think it does. I think it does, because in this case, this defendant was charged with a crime against his wife. He was charged in Indiana, and the crime occurred in Indiana in part, but he was charged with it. And the statute... And one of the things I was going to point out is the fact that, you know, yes, construing the intent of legislation is important, but that intent is not only found in the words of the statute. As you said in People X. Rel. Burkett v. Dockery, a reviewing court may also consider the underlying purpose of the statute's enactment, the evil sought to be remedied, and the consequences of construing the statute in one manner versus another. In People v. Lewis, it is always presumed the legislation did not intend to cause absurd, inconvenient, or unjust results. In Ray Lieberman, statutes must be construed in the most beneficial way which their language will permit so as to prevent hardship or injustice and to oppose prejudice to public interests. You know, this court has already construed this statute in a way that it was not written. And that happened as far back as 1955 in Palumbo, and then it was reaffirmed later, as this court pointed out in Sanders in 1983. This court in Palumbo rejected the argument advanced by a defendant that the statute covered all conversations between spouses, holding instead that the statutory privilege, like the similar common law privilege, applied only to conversations that were of a confidential character. It's become a black letter law that this statute only applies to confidential communications. But nowhere in the statute does the term confidential communications appear. This court recognized that that was what the legislation was getting at. And again, we have to go back to the common law. At common law, traditionally, spouses could not testify against each other at all, or in favor of each other. They were considered to have an interest and they couldn't testify. Frankly, this issue comes most often most often when husbands beat their wives and things like that. At the common law, traditionally women were viewed more or less as chattel. They had no rights. They had no rights in marriages. And this was one of the problems that courts began to recognize. And I have a long quote in the brief from Wigmore to talk about the history of the common law and the fact that the courts recognized that this would shut a woman's mouth to any misdeed of the husband during marriage. And it wasn't a one-way street. It could go both ways. But traditionally, and in fact in almost every case, it's the wife who is the subject of these things and it's the wife's statements that are supposed to come in. Mr. Fisher? Yes. When you talk about communication, but is conduct also considered communication? I mean, we have a situation here where the defendant was beating his wife somewhere in public areas, in the car and on the street and everything. Is that a communication as well? No, it is not a communication. Conduct can be a communication. If I wave or I nod my hand, this was a beating. And I think it would be sort of a perversion to translate every beating into a communication of I'm angry at you. But they do it in public. It's perceived that the public could see it and therefore the conduct is communicated. Well that conduct was, and it's another one of our arguments that this of course wasn't a confidential communication because of the fact that it took place in the truck on the way to the victim's house. So we don't believe that yes, conduct can be communication, but this kind of conduct has never been construed as communication. Can I ask a thing to follow up? What specific statements are you focusing on here? We're just going to talk about communication. You gave us some broad strokes what the facts were. What specific statements are we to focus on? We're focusing on specifically his death threat. I'm going to kill you, I'm going to kill him, I'm going to cut off, blah, blah, blah. The statement that was made at the trailer a month before the murder. It's unclear whether it was in the trailer or in the car on the way there, but he continues to make threats. We don't, the only specific language that Laura says is he threatened to kill me, he threatened to kill him. And we're not sure where that took place. So in other words, if we were concerned about confidentiality, it's not really clear from the record where those statements took place. I don't believe so. Some of the statements probably took place in the trailer. Some of them took place. And because she is allowed to testify generally that he continued to threaten and continued to accuse me of having an affair with the victim, and I continued to deny it. So in any event, as I said, this court, starting with Palumbo, read into the statute something that isn't in the statute. And it did so because it recognized the evolution of the way we treat women in our society, the way we treat marriage in our society. And I've cited cases from numerous other jurisdictions to illustrate the way we've done that. The Trammell case that I cite from the U.S. Supreme Court is interesting because there's some very strong language about privileges in general. Granted that in the Trammell case, you're dealing with a common law privilege, and the Supreme Court, of course, had the authority to get rid of this common law privilege in the federal courts. But they focus on the fact that whenever you have a privilege, you're taking away legitimate, viable, important evidence which takes away from the truth-seeking function of our system. And there's a cost to doing that. And there's a heavy cost to doing that, which is why that court and this court have always suggested that you construe privileges narrowly and exceptions to privileges broadly, which is exactly what we're asking that you do in this case. The exception that we're asking that you do in this case is that you have to be in cases where there's a crime committed against the spouse, against the person or property of the spouse. And certainly this case, as I indicated, this defendant was charged in Indiana. You know, another example of the types of things that get read into the statute or assumed that are in the statute, and another thing that's important here is the status of the wife as either an except in cases of crimes, except in cases of crimes against each other. Except in cases where one is charged, yeah. And again, I'm indicating that this So we're not talking about the case at hand, that the words except in cases of doesn't mean anything? It can, but it doesn't have to mean exactly that. Not in this case? Not necessarily, no. It's not, it doesn't say in this case, it just says in cases. And I'm saying that this court has read this statute in general broadly and can do so again here. In Foskey, you point out that part of this was to prevent, to deter the breakdown of marital harmony when you force an unwilling spouse. And that has, comes forth in a lot of these cases, the term unwilling spouse. You know, the purposes of this law, and everybody recognizes what the purposes were, it's to promote and preserve marital harmony, and to promote confidentiality and between the spouses. Neither of those purposes is effectuated by holding the privilege in this case. Confidentiality is, is, is ridiculous when you think about it, because this woman could and did tell everyone she could about the beating and the threats. I mean, she told the police, she told, she could tell the hospital, she could tell her friends, she could tell everybody in the world, except for the 12 people on the jury. So there's no confidentiality issue. This isn't a woman who is being forced to testify by the state. She's more than willing. If this was a proceeding for domestic violence, would Laura have been able to testify to all of this? Oh, absolutely. So why is it different here? Which shouldn't be. Do we, do we need to look at the, what was the charge in Hammond? I mean, for example, I asked you before, what specific statements? I'm, you know, real picky. You told us earlier that she also testified at trial. The defendant often accused her of having extramarital affairs. Yes. Now, that sounds like a statement. It is, but we But she testified to his statement, and it doesn't sound like that statement is involved in the domestic violence charge from Hammond. Do we have to go back and look at the complaint in the domestic violence case to determine which statements will be able to come in and which will not? I don't think so. First of all, we don't have that. All we have is that she was, he was charged in Hammond, and he was arrested on that warrant. And after that, we don't know what happened in the record. He was not eventually tried on that, basically because he was already serving a long federal sentence and then this sentence, and then in the end, it didn't want him back. But I don't think you have to go that far, because if you look at the word charged with, which is analogous to the word accused of, I don't think you need the exact words. Now, when I say there were no other statements, there were no other quotes, there's no other he said this. How about he said to her, she said that he accused her of having extramarital affairs. Yes. Is that a statement? It's a summary of a statement. Okay. And how is that admissible? It's admissible under the guise of motive in this case. Is it not privileged? No, because it all took place in the context of domestic abuse. Is that, Mr. Fisher, I'd like to go back to my question before. Is that the change or the reason why it should be the same here? Well, yeah, I mean, he's committing a crime against her, and during the time he's committing the crime against her, he's also making statements. When you look at the purpose, again, of the rule, of the law, it's to promote marital harmony. And the exception is for cases where there's a crime being committed against the woman. And generally, yes, the exception applies in the specific case. I agree. But there's no reason that it can't, because the purpose of the law is to protect women, the recognition that the common law was not protecting women. One of the reasons we have this new domestic violence statute on the books is because we recognize that the common law did not protect women in these instances. So in a case where he's committing a crime against her, then no, there should be no privilege. So what you're urging is that we look at the statute and we read broadly a case, let me find the exact language, that we read broadly that language, and that if there was a case that involved domestic abuse at some point in time, that would negate any kind of a privilege that was given to the woman. Yes. Yes, because if you look at this as a continuum, this is what all states and all legislatures have been doing. They've been recognizing that there has been a problem with this privilege, and that it left women in a helpless state. And in order to get past that, to move on into the 20th and 21st century, that this privilege no longer made sense. And the U.S. Supreme Court and the Wigmore article was in the 1960s, recognizing that this privilege makes no sense. The U.S. Supreme Court and Wigmore both said this makes no sense in this day and age. If there is a marriage to preserve, it doesn't come in these cases. Now, if there's an unwilling spouse, sure, and the marriage is still intact, sure. This marriage was a shambles. This marriage, she divorced him while the case was pending. She moved out. She went to, you know, a hospital, and then she hid out from him. She filed charges against him. There is no marital harmony to preserve here. So the purpose of the statute, which is to promote marital harmony and to promote confidentiality, can't be effectuated by allowing the marital privilege in this case. Those are great arguments, Mr. Fisher, and egregious facts. I see the glimmer in your eye. I know you see our problem here. I mean, if we can't get there with respect to this language, it affects our statutory construction analysis as it affects every statute. It does. There are going to be times you're going to be on the other side of the statute saying, hey, you can read into this. It also says, we're focusing on crimes against each other. It goes on to say, or certain offenses involving children. So if this particular husband had an offense against a child anywhere, you know, when he was 16 years old, there was an offense against a child, it can be used in a future case? No, because in this case, we have a crime against the wife at exactly the same time that he's uttering the words, the death threats. And if you look at the- So a crime against each other can be any crime against each other, we're going to say as long as it's at the same exact time that he's uttering the words? I mean, I don't know. Well, I see my time is out, and I'm sure I'll get a chance to get back here in a few minutes. No, he doesn't want to answer. I'm perfectly happy to go on, Your Honor. I can ignore the red light if you can. No, you may if you have something to respond. My response is basically that as I pointed out, this Court's construction of a statute does not end with the plain meaning of the statute. There are, in order to effectuate the actual real intent of the legislature, which you have already done in Palumbo in this case, you've already gone beyond the words of this statute. In fact, you've done it not only with Palumbo, but by writing in unwilling in some of your opinions. This is another example of a case that you can do that. Thank you. Counsel for the appellee. Good morning. May it please the Court. I'm Jennifer Bontrager, and I represent Joseph Tresiak. That's how he pronounces it. I cannot do justice to the original Polish. Unfortunately. But it's Tresiak as he pronounces it. Thank you. So, Your Honors, this is a very straightforward case, much simpler than the State has led you to believe. But first off, I just want to correct a few points from the State regarding charges against Mr. Tresiak in Indiana. We do not know from the record whether Laura ever filed a complaint, whether she signed a complaint. We do know that a warrant for domestic battery was issued in Indiana and that Hammond, Indiana police tried to arrest Mr. Tresiak on that warrant. But beyond that, we do not know anything about any charges being filed or anything in that regard. So, again, as Your Honors were... Ms. Bontrager? Yes. On the other side of the issue, the... It is a statute to promote marital harmony, right? The underlying purpose has been stated as one of promoting marital harmony. Would it be an absurd result for this Court to find that under this fact pattern that there isn't any marital harmony to protect and the statute would have to encompass this kind of conduct? And if we went any other way, we would be fostering an absurd result, which is another statutory construction. No, Your Honor. The fact that we don't perhaps like a particular result does not mean that a rule does not apply. And in addition to marital harmony, part of the concept of marital harmony includes the possibility and the hope of reconciliation, such that even if a marriage looks irretrievably broken, we must hold out hope that there is reconciliation to be had within that. And also to your point, the very purpose of privileges, they are an interesting animal, the very purpose of privileges is generally to exclude relevant evidence. It happens not just in the marital privilege context, it happens in attorney-client privilege, clergy-penitent privilege, doctor-patient privilege. All of those are designed because of a particular relationship to exclude relevant evidence. And let's be clear, the communications that are at issue in this case, these threats of harm, these occurred two months before Donald Cassavich was found dead. So there's not, even if, as I think Justice Tice, you were looking at someone being charged with a crime, the crime against a spouse, the privilege does not apply where there's a crime against a spouse. We're not talking about a crime against a spouse here. This case is not about Laura. This case is about whether Joseph Treziak killed Don Cassavich, and that was, that came two months after this, he was found, Mr. Cassavich was found dead two months after the communications that were at issue in this case. Can I ask you again some specific questions? You filed a motion to eliminate, that's how this began, right? It did. To exclude, so could we be precise, what specific statements, and then perhaps conduct, did you request, are you requesting to be excluded under this privilege? My understanding is that the motion to eliminate was directed at particular statements that Laura eventually related from Mr. Treziak saying, I think you guys are having an affair, it culminated in, I'm going to kill you, I'm going to kill him, I'm going to cut off, and so on. So there's the statements at the trailer, there's statements earlier as well, is it very clear from our record, what are we, what pieces of evidence are we looking at here? Can we tell? Well, we can't exactly, Laura is not exactly precise in her testimony as to whether all of the threats, and my understanding is that we are focused on the threats to kill her, the threat to kill Don, and to do certain violence to Don Kasevich. I don't have the motion to eliminate in front of me. But I believe it's quoted in there. And certainly the conduct that went with it as far as beating her. Then that's my second question. So, we'll have to go back and look to see specifically what was asked to be excluded under this privilege. So we can make an analysis of that. But secondly, you believe that the motions to eliminate also argue that certain conduct was privileged. How do you get there? If the statute talks about communications, why are we talking about conduct? Because actions are also communications. Actions that are directed at an individual are communications. That's been repeatedly held to be true. Under the statute, under this privilege, that there's conduct that's been excluded? Yes. Yes, there has been. I know I can't find it at the moment. I know there's a case in which counting out money because it was done in a directed fashion was held to be a communication that was privileged. Certain nods and certain actions taken towards an individual. We're not talking about simply what an individual observes another individual doing. It is generally directed actions or directed conduct. I'm not sure that I answered all of your initial question entirely as far as where the communications occurred. It's not entirely clear from Laura's testimony whether it all occurred at their home or whether it all occurred in the truck on the way over or some combination thereof. But it is clear that none of it took place out in public. They were alone. The communication was direct. It was private. And it was within their marriage. So that is protected communication. How can you argue that his threats and actions remain confidential? Didn't he drive Laura from Hammond to Hegwich on public streets? You can presume that some people might have seen it. You can also park in front of Cassavich's trailer. Can we presume this could have been seen by other people too? Well, we can presume that some things might have been seen but we know that no one else saw the beating. But didn't they see bruising? Couldn't they have seen the results of it? There's no evidence of that. And the results would be a different thing than the communication itself. The evidence entirely shows that the communications here were confidential. Unless it's affirmatively shown otherwise, confidentiality is presumed. Even if they took place in public? Well, they didn't take place in public. Nothing took place outside of them being alone. There's no evidence of the presence of a third party. There's no evidence of anyone else being around. The only thing that happened, arguably in public, was Mr. Trusiak knocking on Cassavich's door. Keeping with that theme, what do we do with the findings of the trial court at the time of the hearing on the motion? He said, it suggests the defendant did not intend the threats to be confidential, that he wanted his wife to convey them to Cassavich in order to convince Cassavich to stay away from her and to dissuade Cassavich from helping her escape from the defendant. It suggests the defendant himself was relying upon the fear produced by such threats rather than upon any confidential relationship of the marriage to achieve these goals. Then he allowed it in. So what do we do with that? Is there a finding that he waived any confidentiality? No. And that finding is utterly at odds with the record. The plain language of the threats as they were spoken indicate that Mr. Trusiak intended them to be confidential. They are direct. They are specific only to Laura. They are directed only at Laura. They do not contain any language. They do not contain any suggestion or direction that she should communicate them to anyone else. It's not as if he said, you tell that man that I'm going to kill you and I'm going to kill him. None of that. It simply says, I'm going to kill you and I'm going to kill him too. He doesn't direct her to do so. Where are we if, in looking at the record, we agree with the trial judge on that? I simply don't think that such a conclusion is supported by the record. I understand that. But if we, in looking at the record, say the trial judge was right, would that constitute a waiver and that the privilege would not apply in that case? If there is an affirmative, if you find that there is an affirmative showing that the communications were not intended to be confidential, based on case law, it would seem that the privilege would not apply. But there is no specific language within the privilege statute itself that expressly requires confidentiality. The public court went the opposite way and your position is that the trial judge heard, right? Absolutely. Like I said, there is no express requirement of confidentiality within the plain language of the privilege statute. Is your construction of the privilege broad or narrow? Narrow. And how so? These are simple, objective exceptions. There is nothing ambiguous about them. The only exceptions are very specific. They are very narrow. The privilege generally simply must be applied. So anything, according to your theory, correct me if I'm wrong, anything that was said or done between the two parties is privilege? Yes. Within the marital construct, yes. Just based on the plain language of the statute. Neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage except, and then we follow with the very specific instructions. And it would be also your position that case in the statute when it talks about case of abuse against the other it would mean this case. It would have to be a case where the wife was the victim. Absolutely, Your Honor. I don't think it is even logical to suggest otherwise. No Illinois courts, to my knowledge, have ever found an exception to privilege because a defendant is charged with violence against a spouse in a completely separate case. As I said before, this case was not about Laura or domestic violence. This case was about whether Joe Trusiak killed Don Kasevich two months after, let's be clear, two months after these purported threats occurred. What effect does the warrant have on this case? The warrant? Yes, there was testimony that there was a warrant issued by him and Indiana police. Does that have any effect on this case? No, it has no effect whatsoever. You've stressed a couple of times that these comments were made two months before the murder. Would it make a difference if it was made the day before? A day before? Yes. The fact of it being two months earlier certainly seems to bleed off relevance as far as the state's reliance on this for motive evidence. If it were substantially closer in time, that would be a much clearer motive. So it would come in if it goes to motive? No, I think it would still be utterly covered by the privilege and inadmissible. But to the extent that the state has suggested that this was all part of one big course of conduct such that the violence to Laura is somehow part and parcel of the murder of Don Kasevich, I just wanted to stress that this did occur two months earlier as a completely separate incident from what occurred here. Finally, the state has not and cannot demonstrate that the error here in introducing the privilege communications was harmless beyond a reasonable doubt. The state itself acknowledged that Nilsen's testimony on this point was crucial motive evidence for them in a case that is otherwise entirely circumstantial. The improper admission of the privilege communications can be harmless beyond a reasonable doubt only where the same facts are proved by other evidence. And there's no other evidence even suggesting a motive here given there's no direct evidence even linking Truziak to the murder. What about the blood found on the shard of the glass? Yes, Mr. Truziak's blood was found on a shard of broken glass. Is that not direct evidence? Not at all. It's found outside the trailer. We don't know exactly where that broken glass came from. It's found on top of a shed. It's not explicitly linked to any of the broken windows. We don't exactly know when it got there. It's also a mix of Mr. Cassavich's DNA and some unidentified mail. And there is also a chain of custody anomaly in that the broken glass, this piece with blood on it, was improperly... It was listed as with other broken glass and it was improperly bagged with some other evidence that was found on the ground also outside. Nothing links Mr. Truziak to the inside of that trailer despite the fact that a huge melee had occurred in there. Mr. Truziak was seen the day of the murder. He did not have injuries on him consistent with having been in a large fight. He had a single small puncture wound to his wrist. He didn't have injuries to his hands that would have been consistent with him beating someone up. He did not confess to this crime when he was arrested for it several months later. There is simply insufficient evidence to link him to this murder. Wasn't there testimony from some other woman that he went to the house and washed his clothes and cut his hair? Yeah, he had his hair cut. It's all circumstantial evidence. It's circumstantial and all of the witnesses that that evidence came from are drug addicts. They admitted that they had some memory problems. What about the prescription bottle that was found in the friend's house with Kasevich's name on it? That was there as well as numerous prescription bottles for other individuals. There was some suggestion that Mr. Varnas sold other people's prescription medications. He also knew Mr. Kasevich. A lot of the people in this case are connected through drug use and drug sales. Again, that's found in Mr. Varnas's house not in Mr. Treziak's house. This was crucial evidence. The state argued it at length as this very important motive. Counsel Bick, just to this waiver argument, I didn't note in the appellate court opinion where they even mentioned, they may have mentioned the comments of the judge but their analysis never focused on whether or not this wasn't confidential and the defendant really wanted spoken. Was that argued in the appellate court at all? No, that was not the focus of the argument. The focus of the argument was the trial judge's final conclusion where she found that the marriage was in shambles and she basically carved out this exception for when there's a marriage that appears to be in shambles then the privilege should not apply. And the dissent really doesn't touch upon it either, right? No, I don't believe so. But it was fully argued, obviously, at the motion below, right? So we do have a complete record on that issue? You certainly have a complete record. That was not, though, the focus of either at trial, I mean, I understand you were reading from the transcripts but that was really not the focus at any point before we got to this court, in fact. The focus in the trial court was very much this in shambles exception that the judge decided to carve out in order to admit this evidence that was, as I said, undoubtedly determinative evidence for the jury. If there are no other questions, the appellate court correctly concluded that the communications at issue here simply do not fall into any exception within the marital privilege statute and this court should do the same. Thank you. To Justice Thomas' question regarding the findings of the judge, we did argue in the appellate court and we have argued in this case in our brief that the defendant did not mean these communications to be confidential because he meant them to be relayed to the victim, the threat to be relayed to the victim. We've argued that before. With regard to Justice Tice's question about the motion in limine, the motion in limine was directed to statements. There was a motion in limine directed to conduct but that was a global motion in limine relating to proof of other crimes and abuse in general. And the conduct aspect leads me to the question of harmless error should we have to get there. And that is that let's assume for the purposes of argument that the statements are excised from the record. You would still have the evidence that Laura received a phone call from the victim. The defendant then began to beat her and say things to her. He began to beat her. He tied her up. He drove her across a state line to Illinois. He pounded on the door of the victim. He continued to beat her. He drove her back. The jury is going to know that there is a motive here. They're going to understand the motive. So the motive would still come in. That, in addition to all the other evidence and there was a lot of other evidence you've discussed some of it, the DNA. The defendant was the major contributor. There was a minor contributor. The major contributor means it was mostly his DNA in the blood. There were some other unidentified persons but his blood is located on a piece of glass that wasn't broken out before the incident. There's the washing. There's two different people who see him with cuts. He isn't actually arrested for a little while later until he barricades himself when the ATF come and everything else. He doesn't have any more fresh injuries but he did have injuries that day. He tells inconsistent stories and demonstrably wrong stories about those injuries. He also asks two different people did you hear about any murders down in a trailer park in Hegwisch or on the south side of Chicago? There hadn't been any murders for a year in the trailer park and the police at the time he made those statements didn't yet know there had been a murder. There's the hiding of the gun. There's the description of the gun. There's the finding of the gun in the same place that the prescription bottle is found. So there is a lot of other evidence that would indicate that the statements in this case were introduced improperly were introduced harmlessly. If we agree with you the defendant raised seven claims in the appellate court and the appellate court only focused on one. What would be the result here? You have to remand for the resolution of those other issues. The appellate court didn't decide them at all. It left them all in abeyance. And that would be our request today for the reasons that we've stated today and in the briefs, that your honors reverse this case and send it back to the appellate court for resolution of those six remaining issues. Thank you. Thank you. Case number 114491, People v. Joseph Treziak is taken under advisers agenda number 6.